[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
In this proceeding seeking discharge or reduction of a CT Page 3674 mechanic's lien pursuant to G.S. § 49-35b the court has previously found on the record that probable cause exists to sustain the validity of the lien. The court must now determine whether the petitioner has proved by clear and convincing evidence that the validity of the lien should not be sustained. Ibid.
The petitioner challenges the validity of the lien because the lienor's work was a home improvement performed by a contractor within the meaning of G.S. § 20-419 without complying with the requirements of the Home Improvement Act, § 20-418 et. seq. (HIA). In his post hearing brief the petitioner asserts the additional ground of noncompliance with the terms of G. S. § 49-34 (1) (A). Because no evidence or argument was offered concerning this ground the court will not consider it.
The threshold issue is the status of the respondent, viz: whether the respondent was a contractor within the meaning of § 20-419 (3) or a subcontractor as described by our Supreme Court in Meadows v. Higgins, 249 Conn. 155 (1999).
In Meadows, the court approved a principle first enunciated by the Appellate Court in O'Donnell v. Rindfleisch,13 Conn. App. 194, 195 (1988) that the HIA does not apply to subcontractors. Thus, this court must determine whether the respondent was a subcontractor by examining the particular facts of this case.
As a result of a fire the petitioner needed major reconstruction work performed on his single family residence. To that end he hired Robert Aldridge a licensed Connecticut architect to prepare plans and drawings and to act as construction manager for the rebuilding project. While Aldridge prepared a written agreement, the petitioner never signed it. Nevertheless, the evidence demonstrated clearly that Aldridge in fact acted in the capacity, of construction manager, viz: obtained bids and estimates, selected and hired the subcontractors, assumed responsibility for supplying all materials and "oversaw" or supervised the work. The construction manager's responsibility included obtaining estimates for 38 separately specified materials and construction trades, assuming conformance of the work to his plans, arranging for commencement of construction, securing completion of the work within six months and assuring that the quality of the work was good, workmanlike and in accordance with appropriate construction industry standards. CT Page 3675
The work proceeded in three phases. The construction manager supervised phases one and two but terminated his relationship with the petitioner prior to commencement of phase three. He solicited and obtained a price from the respondent for demolition, salvaging, reuse and replacement of materials for the sum of $43,500. The petitioner accepted this price, the respondent performed the work and received payment in full (Phase one). Thereafter, at the construction manager's request, the respondent presented the petitioner with an estimate of $31,300 to perform phase two which consisted of masonry and carpentry work. The estimate was accepted, the respondent performed the work and the petitioner paid him in full. At some point after the completion of phase two, the construction manager and the petitioner terminated their relationship. Within a brief period of time the respondent and the petitioner entered into an agreement which the parties referred to as phase three. It is important to note that the construction manager had nothing to do with the negotiation or supervision of this phase. The parties differ as to the nature of their agreement. The respondent characterizes it as an agreement for "time and material" whereas the petitioner understood that the memorandum embodied in Exhibit 2 constituted a fixed price for completion of the work.
The court finds that Exhibit 2 constitutes the agreement for the performance of phase three. Thus, the amount in controversy between the parties is $40,000, the price provided for in Exhibit 2.
Because only phase three remains unpaid the court must determine whether the respondent's status was that of a subcontractor or contractor within the meaning of the HIA as to that phase. The court observes that while the petitioner engaged the architect as a construction manager, the architect's duties and responsibilities were remarkably similar to Simon's duties and responsibilities in Meadows v. Higgins, supra. In fact, one of the key characteristics of a general contractor[1] was absent in that case as it is absent here. In both cases the construction manager was not paid by the homeowner for work performed by the claimant. Rather, the homeowner in both cases paid the claimant directly. So, notwithstanding that one of the chief ingredients of a general contractor was absent, the court applied a functional equivalency test in upholding the attorney trial referee's finding that Simon performed the functions of a general contractor and the normal duties of a home improvement CT Page 3676 contractor.
The responsibilities of the construction manager in this case casts him in the role of a general contractor and the court finds that this is the very capacity in which he served until commencement of phase three. Thus, the respondent served as a subcontractor during phases one and two. The nature of the respondent's relationship with the petitioner, however, changed upon commencement of phase three. Because Aldridge had terminated his contractual relationship with the petitioner at this juncture, had nothing to do with phase three, and no one succeeded to his responsibilities, the respondent thereupon became a contractor as that term is defined G. S. § 20-419 (3) and construed in Meadows v. Higgins, supra.
Whether at this point the respondent was required to comply with the terms of the HIA depends upon whether the work that he performed in phase three constituted part of "the construction of a new home" within the meaning of G. S. § 20-419 (4) (A). The scope of the work included in phase three is described in Exhibit E as involving "the construction of retaining walls, excavating for a front porch, changing a wall in the family room, changing a master bathroom, changing a wall in the hall bathroom, adding two windows".
It is clearly apparent that except for the retaining wall, these items in and by themselves constituted an alteration of or replacement to an existing dwelling and would not ordinarily fall within the ambit of new house construction unless they and the wall were an intregral part of phases one or two, and that depends upon whether these phases qualify as "the construction of a new house".
The petitioner argues that the construction management contract between himself and the architect uses the term "reconstruct" and that in fact, phases one and two were a replacement and rehabilitation under G. S. § 20-419 (4). The respondent on the other hand contends that what may have been planned as a replacement/rehabilitation turned out to be construction of a new home because under the building code, a dwelling which has suffered 60% or more damage must comply with the then applicable code rather than the code that was in existence at the time of the original construction. The estimate which the architect presented to the Easton building official for permit purposes was that 75% of the dwelling had been damaged. Although relevant to CT Page 3677 the issue, neither the architect's characterization of the work as "reconstruction" nor the building official's requirement that the work comply with the code specifications applicable to new construction is controlling as to whether the work constituted a home improvement under subsection (4) of the HIA.
As noted by the court in Seaport Electric v. Friedlander
CV91-0120366S, J.D. Stamford/Norwalk at Stamford, (May 24, 1993), the term "replacement" is not defined in the statute. Borrowing from that decision, "replace" means "to serve as a substitute for". Clearly, the respondent's written proposal called for the substitution of new material or reuseable old material for that which was irreparably damaged. Likewise, the term "rehabilitation" is not statutorily defined. Relying again on a simple dictionary definition, the term is defined as "to put back in good condition". Webster's New World Dictionary, 2nd College Ed. 1978 at 1197. The respondent's written proposals and the testimony of the parties establish clearly that the task of the respondent was to reutilize what was salvageable, put the house back in good condition and add such alterations and additions as may have been necessary to conform to the architect's plans. None of this comprised "construction of a new house".
Because the respondent has failed to comply with the terms of the HIA he can not prevail against the petitioner's clear and convincing proof that the mechanic's lien is invalid for the reasons discussed above. Accordingly, the lien is ordered discharged.
BY THE COURT,
Mottolese, Judge